UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
MAYA ROYTLENDER,

                Plaintiff,

             -against-

D. MALEK REALTY, LLC *et. al.*,

               Defendants.
-------------------------------------------------------------------X

**OPINION
<u>AND ORDER</u>**

21-CV-00052 (JMW)

**A P P E A R A N C E S:**

> **Paul L. Dashefsky, Esq.**
> 317 Middle Country Road
> Smithtown, NY 11787
> *Attorney for Plaintiff and Counter Defendant Maya Roytlender*
>
> Jonathan D. Farrell, Esq.
> Daniel Frank Carrascal, Esq.
> Mark A. Radi, Esq.
> **Meltzer Lippe Goldstein & Breitstone LLP**
> 190 Willis Avenue
> Mineola, NY 11501
> *Attorneys for Defendants and Counterclaims D. Malek Realty, LLC, Malek Management
> Corporation, StaffPro, Inc., David Malek, and Michael Malek*

**WICKS,** Magistrate Judge:

What started out as a relatively straightforward claim for overtime wages due under the

Federal Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") quickly morphed

into something far different and far more complex.  Defendant interposed counterclaims

grounded in fraud, breach of fiduciary duty and the faithless servant doctrine.  Through years of

discovery – and once the camel's nose entered the tent – this wage and hour claim became a case

about whether Plaintiff embezzled and misappropriated funds from Defendants over a period of

years.

Plaintiff, Maya Roytlender, commenced this action against Defendants D. Malek Realty, LLC ("D. Malek Realty"); Malek Management Corporation ("Malek Management"); StaffPro, Inc. ("StaffPro"); David Malek; and Michael Malek (collectively, "Defendants") pursuant to the FLSA, 29 U.S.C. 201, *et seq*. and the NYLL.  Discovery is complete and a trial date is set for September.  Defendants now move for summary judgment to dismiss Plaintiff's claims and for judgment on their counterclaims.  (ECF No. 123.)  Plaintiff strenuously opposes Defendants' motion.[1]  (ECF No. 124.)  For the reasons set forth below, Defendants' motion for summary judgment is **GRANTED** in its entirety.

## BACKGROUND

The following facts are taken from the Complaint (ECF No. 1), Defendants' Counterclaims (ECF No. 14) and the parties' 56.1 statements (ECF Nos. 114-1, 115, and 117).[2]

---

[1] Notably of the 282 statements in Defendants' 56.1 statement, Plaintiff has responded to 265 of them as "uncontroverted."  (ECF No. 117.)

[2] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech.*, No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be specifically controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").  Further, to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements.  *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

**The Parties**

Plaintiff is a Brooklyn, New York resident.  (ECF No. 1 ¶ 4.)  The Corporate Defendants are property management companies.  (ECF No. 114-1 ¶ 1.)  D. Malek Realty is a New York limited liability company.  (ECF No. 1 ¶ 5.)  D. Malek Realty's principal office is located in Valley Stream, New York.  (*Id.*)  Malek Management is a New York corporation, also located in Valley Stream.  (*Id.* ¶ 6.)  David Malek resides in Lawrence, New York, and is the principal and owner of D. Malek Realty and Malek Management.  (ECF No. 114-1 ¶ 2.)  Michael Malek is a property manager for D. Malek Realty and Malek Management.  (*Id.* ¶ 3.)  Defendant StaffPro is a New York corporation located in Inwood, New York and is "Defendants' Professional Employer Organization" which processes and issues payroll based on information entered into its system.  (*Id.* ¶¶ 4-5; ECF No. 1 ¶ 7.)  StaffPro uses a "web-based portal in to which Malek Management enters its employees' hours. StaffPro [] processes and issues payroll to Malek Management's employees from StaffPro's bank accounts based on the information entered into the portal."  (ECF No. 123-78) ("Affidavit of Elly Geldwerth").

**Plaintiff's Work as an Employee**

Plaintiff was employed as an Office Clerical employee for Defendants Malek Realty, Malek Management, StaffPro, and the individual Defendants.  (ECF No. 1 ¶¶ 10, 13.)  She began her employment around October 2012 but was terminated in October 2020.  (*Id.* ¶¶ 13-14.)  Plaintiff alleges that from 2018 to 2020, she was paid approximately $27.86 per hour and worked seven days a week—Monday to Thursday from 9:00 AM to 5:00 PM and Fridays from 9:00 AM to 1:00 PM.  (*Id.* ¶ 16.)  She claims she worked overtime on the weekdays and weekends—that is, she worked over 40 hours for some weeks—and should have been paid an overtime hourly rate of $41.79.  (*Id.* ¶ 17.)

Plaintiff claims she is owed $4,875 in regular wages.  (ECF No. 1 ¶ 15.)  She also asserts that she received only $21.86 an hour—instead of the overtime hourly rate for overtime hours worked—and worked 4,963.5 in overtime hours.  (*Id.* ¶ 22.)  She states the total sum owed for the overtime hours is $207,424.66.  (*Id.*)  In addition to the regular and overtime wages due, Plaintiff also alleges she has not been paid for 96 holiday hours from 2018 to 2020 which totals $2,098.56.  (ECF No. 114-1 ¶ 36.)

Plaintiff, however, has only been able to produce handwritten time records to support her position.  (ECF No. 114-1 ¶ 38.)  These self-created notes demonstrate that she worked 1,242.66 overtime hours at most.  (*Id.* ¶ 39.)  Defendants state that from January 2017 to October 2020 Plaintiff was paid $188,895, which is commensurate with the hours she worked.  (*Id.* ¶ 17.)[3]

**Defendants' Counterclaims**

Defendants claim that Plaintiff engaged in various schemes to defraud Defendants and stole millions from them.  They assert causes of action for fraud and breach of fiduciary duty, and a claim under the faithless servant doctrine.  (ECF No. 14 at 17-19.)  Plaintiff in turn, denies stealing from Defendants.  (ECF No. 115 ¶ 268.)

1. **Fictitious Employees**

Plaintiff was allegedly the only individual responsible for monitoring and reporting employees' hours and reporting that information back to StaffPro, which would then process and issue payroll checks.[4]  (ECF No. 14 ¶¶ 9-10.)  Plaintiff however claims that another employee

---

[3] On April 1, 2024, Plaintiff dismissed her claims pursuant to NYLL §§ 195 and 198 related to failure to provide written notices and wage statements.  (ECF No. 121.)

[4] Plaintiff states that "she never utilized any discretion in submitting such payroll hours to[] StaffPro; she solely entered the hours with which she was provided by Defendants' employees and approved by the Defendants' Managing Agents to StaffPro for processing."  (ECF No. 115 ¶ 23.)  The platform on which she entered the information was called the "portal."  Regular hours are entered into the portal and overtime hours need to be approved by the manager before those time sheets are entered into the portal.

was responsible for ensuring that all payables were accurate.  (ECF No. 115 ¶ 6.)  She also previously testified that she assisted in submitting new hire information which was ultimately forwarded to StaffPro.  (ECF No. 114-1 ¶¶ 19-20.)

Defendants allege that Plaintiff engaged in payroll fraud.  Specifically, when she would submit the hours and payroll information to StaffPro, she would add fictitious individuals to Defendants' payroll.  (ECF No. 14 ¶ 20.)  She even went as far to falsify new-hire documents for these employees and submit time records on their behalf.  (*Id.* ¶ 21.)  These employees would receive paychecks for hours they never worked.  (*Id.* ¶ 27.)  Plaintiff allegedly created several fake identities for the following "employees": Aleksandr Leontyev, Michael James II, and Valerie B. Leon.  (*Id.* ¶ 30.)  From Leontyev, James, and Leon alone, Plaintiff received $161,590.63.  (ECF No. 114-1 ¶ 142.)

Leontyev allegedly agreed for Plaintiff to put him on Defendants' payroll so he could repay Plaintiff for a previous loan.  (ECF No. 114-1 ¶¶ 41-42.)  He would give her 70% of the monies that came from his checks.[5]  (*Id.* ¶ 43.)  He never worked for Defendants but in fact lived in Florida from October 2016 to April 2019—that is, during the months he was purportedly employed for them.  (*Id.* ¶ 46.)  Leontyev was unlawfully paid $282,894.50 before taxes for regular and overtime hours that he never worked, repair and maintenance work he did not

---

(*Id*. at 89). The hours employees entered on their time sheets are inputted into the portal so StaffPro can issue the appropriate check.  (*Id*. at 264.)  To rebut any claims of her involvement in the alleged schemes, she states that she was not a signatory on any of Defendants' accounts and other employees were involved in the returning of checks.  (*Id.* ¶¶ 28, 30.)

[5] Plaintiff disputes any involvement in hiring Leontyev or the fraudulent scheme outlined above.  (ECF No. 115 ¶ 43.)  She does admit that he owed her money but states she is unaware if the money she ultimately received from him was wrongfully obtained.  (*Id.* ¶ 66.)

perform, and bonus/vacation/sick and holiday pay he never had to begin with.  (*Id.* ¶¶ 58-62.)
Leontyev transferred $126,571.41 to Plaintiff to repay his debt to her.  (*Id.* ¶ 69.)

James was Leontyev's roommate who also lived in Florida during the time he was
allegedly employed for Defendants as a doorman/porter and on their payroll.[6]  (ECF No. 114-1
¶¶ 72, 78-81.)  James completed an employment application and submitted his bank account
information.  (*Id.* ¶ 76.)  However, James did not know what the job he applied for entailed nor
did he know any of the Defendants.  (*Id.* ¶¶ 82-83.)  Yet, he received direct deposits from
StaffPro for work he never performed.  (*Id.* ¶¶ 88-89.)  He received a total of $96,984.85 for
these hours not worked.  (*Id.* ¶ 97.)  James would transfer 80% of the monies to Leontyev and
Leontyev would keep 10% for himself and send the remaining 70% to Plaintiff.  (*Id.* ¶¶ 101-02.)

Around March 2020, Leontyev asked to be removed from the payroll but Plaintiff would
only remove him if he found someone to replace him.[7]  (ECF No. 114-1 ¶¶ 108-09.)  Leontyev
enrolled his sister, Valerie Leon, to replace him and she agreed to send all proceeds to Leontyev.
(*Id.* ¶¶ 110-11, 113.)  She submitted all required documentation and was staffed as a doorman for
Defendants, but never performed any work for them.  (*Id.* ¶¶ 115, 118, 125.)  She was paid a
total of $37,783.67 until October 2020 for work never performed.  (*Id.* ¶¶ 132, 135.)  Leontyev
would transfer 70% of the proceeds to Plaintiff, reserving 30% for himself.  (*Id.* ¶ 137.)

2.  **Fictious Hours for Existing Employees**

In a second scheme, Plaintiff would "report fraudulent hours for existing or former
employees."  (ECF No. 14 ¶ 31.)  For example, she reported that an existing porter named Ihor

---

[6] Plaintiff claims she does not know Michael James.  (ECF No. 115 ¶ 77.)

[7] Plaintiff emphasizes she herself never engaged in a scheme to wrongfully obtain payments from
Leontyev.  (ECF No. 115 ¶ 108.)

Dubno worked hours of overtime and for repair and maintenance work at a location he had never entered. (*Id.* ¶¶ 32-35.) This resulted in Defendants issuing a total of $309,255.03 to Dubno for hours he had never worked or personal or sick time he had never used in 2019. (ECF No. 114-1 ¶¶ 36, 217-22.)

Guido Salvo was also a porter for Defendants. (ECF No. 114-1 ¶ 148.) Salvo was paid for over 2,000 overtime and regular hours and $19,715 for repair and maintenance work performed. (*Id.* ¶¶ 231-32.) However, his time sheets did not support these fictitious hours worked. (*Id.* ¶¶ 234-35.)

This scheme, in conjunction with the fictitious employees scheme, led to Plaintiff's theft of over $1 million from Defendants.

3. **Theft of Tenant Deposits**

In addition to her duties associated with inputting time worked and payroll, Plaintiff was also responsible for interacting with tenants regarding security deposit checks and accepting rent payments from tenants. (ECF No. 14 ¶¶ 11-14.) Typically, a tenant may forfeit their security deposit due to a violation of the lease agreement or damaging the premises. (*Id.* ¶ 40.) If it is not forfeited, however, the deposit must be returned to the tenant. (*Id.* ¶ 41.)

In a third scheme by Plaintiff, she would tell the tenant their deposit was forfeited and simultaneously tell the Defendants that she had returned the deposit to the tenant—meanwhile, this was all a sham to keep the security deposit monies or split them with other co-conspirators who were employees of Defendants. (ECF No. 14 ¶¶ 42-43.) Such tenants included Lashanda Allen-Williams, Steven Nichols, Tyrell Harris-McLaughlin, and Michael Lewis who terminated their leases but never received their security deposits. (ECF No. 114-1 ¶¶ 164, 171-72, 180-81, 207.) Further, on different occasions, Defendants' Property Manager Aaron Lazar, Leontyev,

Dubno, James, and Leon also had security deposit checks in their names deposited into Plaintiff's personal bank account.  (*Id.* ¶¶ 144, 156, 178, 194, 209.)  These individuals testified they did not authorize her to deposit those checks into her bank account.  (*Id.* ¶¶ 146, 151, 157, 184, 198, 211.)

Additionally, Plaintiff would also deposit into her personal bank account, a security return and paycheck bearing Salvo's name.  (ECF No. 114-1 ¶¶ 149-50.)  But Salvo never lived in any of Defendants' buildings nor did he authorize any issuance of any checks into Plaintiff's account.  (*Id.* ¶ 154.)

There were also sixteen (16) security deposit return checks made payable to Plaintiff's daughter, Nicole Roytlender, that were subsequently deposited into Plaintiff's personal bank account.  (ECF No. 114-1 ¶¶ 168-69.)  These payments amounted to $2,114.84.  (*Id*. ¶ 169.)  Plaintiff testified that her daughter never lived in any of Defendants' properties and Plaintiff could not recall why the security return checks payable to Nicole were deposited into her own account.  (*Id*. ¶¶ 174-75.)

When Defendants confronted Plaintiff about these checks in October 2020, Plaintiff returned almost $32,000 to Defendants.  (ECF No. 14 ¶¶ 54-55.)  She claimed the fact that these checks came from a company managed account and bore the same individuals' names was just a "computer mistake."  (ECF No. 114-1 ¶¶ 253-54.)  Defendants informed Plaintiff that she could not return to work until the monies were repaid to the company accounts.  (*Id.* ¶ 266.)  However, Plaintiff did not repay the money she owed to Defendants—instead, she had taken the $32,000 from Defendants' reserve accounts.  (ECF No. 14 ¶ 56.)  She had gone as far to "indicate" that Robert Malek authorized these payments from those accounts.  (*Id.* ¶ 59.)  She was terminated later that month.  (ECF No. 114-1 ¶ 268.)

4. **Personal Expense Payments Using Company Funds**

Plaintiff allegedly used the company's bank accounts to pay for her rent, car, and utilities. (ECF No. 14 ¶ 60.)  Then, on company bank records, she would alter the payments to appear as "legitimate business expenses."  (*Id.* ¶ 61.)

Specifically, from September 2019 to August 2020, Defendants unknowingly paid Plaintiff's mother's, Nonna Yelan's, Optimum bill, totaling $2,253.63.[8]  (ECF No. 114-1 ¶¶ 243, 250.)  Plaintiff claimed these payments were for the building's superintendent, Jose Soto, not for Yelan, but no supporting documentation was ever presented as requested and required by Defendants.  (*Id.* ¶¶ 244-47.)

**Plaintiff's Termination from Neptune Associates**

Defendants proffer evidence demonstrating that Plaintiff engaged in a similar scheme at Neptune Associates, Plaintiff's subsequent employer, whereby checks not payable to her and her daughter were deposited into her personal account.  (ECF No. 114-1 ¶¶ 270-82.)  Her actions there ultimately led to her termination.  (*Id.* ¶ 281.)  Plaintiff however states that this evidence is unrelated to her employment with Defendants and therefore inadmissible under several Federal Rules of Evidence.  (ECF No. 115 ¶¶ 270-82.)  Defendants however offer this evidence, not for propensity purposes, but to show that Plaintiff acted in a similar manner throughout her employment with Defendants.  (ECF No. 117 ¶¶ 270-82.)

---

[8] Plaintiff however objects stating that "Defendants paid her personal expenses as part of her compensation."  (ECF No. 115 ¶ 251.)  Defendants counter that they did not knowingly authorize payment of her *mother's* Optimum account nor has Plaintiff produced evidence to support her position. (ECF No. 117 ¶ 251.)

**Subsequent Investigation by the Kings County District Attorney's Office**

The Kings County District Attorney's Office opened an investigation concerning Plaintiff's alleged theft and embezzlement from Plaintiff's employment with Defendants, but has not yet found "any wrongdoing" according to Plaintiff.[9]   (ECF No. 115 at 25-26.)  Defendants respond that a criminal case carries a much higher burden than a civil one and is thus immaterial to any present issue.  (ECF No. 117 at 66.)

## PROCEDURAL BACKGROUND

The parties consented to the undersigned for all purposes on November 30, 2023.  (ECF No. 110.)  The Court extended the time for the parties to move for summary judgment to January 15, 2024 (Electronic Order dated Dec. 5, 2023) and set a trial date for September 9, 2024 (Electronic Order dated Dec. 15, 2023).

Defendants filed their pre-motion conference letter and submitted a proposed briefing schedule for their anticipated motion for summary judgment (ECF No. 114).  The Court then set an in-person pre-motion conference for February 26, 2024.  (Electronic Order dated Jan. 15, 2024.)  Plaintiff opposed Defendants' letter (ECF No. 116).  At the conference, the Court set a briefing schedule, directing the parties to bundle file the motion for summary judgment on or before May 15, 2024.  (*See* ECF Nos. 120.)  The parties bundle-filed the motion and the Court heard oral argument on Defendants' motion and reserved decision.  (ECF No. 129.)  At Oral Argument, the Court allowed the parties to submit letters to clarify the identified discrepancies in the monetary amounts as discussed during the Oral Argument and Defendants did.  (*Id.*; ECF No. 130.)

---

[9] This, however, contradicts her statement in her affidavit which states that she was "[n]ever contacted any agent or representative of law enforcement, or of any office of a District Attorney, concerning any allegations of wrongdoing involving the Defendants."  (ECF No. 115 at 30.)

## THE PARTIES' CONTENTIONS

In their motion, Defendants request that the Court dismiss the Plaintiff's complaint and award judgment and damages to Defendants on their counterclaims in the amount of $1.14 million. (ECF No. 123-84 at 29-30) ("Defs' Memo of Law.")  As to Plaintiff's FLSA and NYLL claims, Defendants state that Plaintiff has failed to produce competent evidence to establish she owed any unpaid overtime. (*Id.* at 26-27.)  Namely, Defendants explain that Plaintiff's discrepancies between her Complaint and handwritten notes demonstrates her incredibility and she has not produced any additional information to remedy these discrepancies. (*Id.* at 29-30.)

As to their counterclaims, Defendants *first* claim that there is "overwhelming indisputable evidence" demonstrating that Plaintiff was a faithless servant from January 2017 through October 2020, which is evident from her schemes.  (*Id.* at 21.)  Specifically, Plaintiff issued unauthorized checks to real and fictitious individuals then deposited them into her personal bank account (*id.* at 21-22.); processed applications and payroll for fictitious employees (*id.*); facilitated excessive payroll for current employees that were unsupported by their timesheets (*id.* at 22); and pocketed company funds for personal use (*id.* at 23).  Further, since Plaintiff personally benefited financially from her fraudulent schemes and since her disloyalty exceeds the time of her overtime claims, Defendants contend that her FLSA claims fail altogether and they should be awarded all compensation—approximately $189,000—paid to Plaintiff during her period of disloyalty in addition to the kickbacks and stolen funds, which is $951,107. (*Id.* at 23-24.)

*Secondly*, Defendants also claim that Plaintiff knowingly breached her fiduciary duty to Defendants by engaging in several fraud element schemes to embezzle Defendants' funds

11

repeatedly.  (*Id.* at 25.)  *Finally*, Defendants claim that clear and convincing evidence

establishes Plaintiff's fraudulent schemes. (Defs' Memo of Law at 25.)  For instance, there is

undisputed evidence that shows Plaintiff falsified new-hire paperwork for several people and

submitted false unauthorized hours for those people, who admitted they never performed these

hours.  (*Id.* at 25-26.)  Defendants state that they relied on all of the material misrepresentations

Plaintiff committed and she "induce[d] Defendants' reliance and trust" which led to their

financial loss of more than one million dollars. (*Id.* at 26.)

      Plaintiff contends that the motion for summary judgment should be denied for several

reasons: (1) there is no indication that Defendants has sued the other individuals involved in this

case to retrieve the stolen monies which raises questions about the veracity of Defendants'

claims given that Plaintiff denies any involvement in the schemes (ECF No. 124 at 9)

("Plaintiff's Opp."); Plaintiff never signed any of the checks; rather they were signed by

Defendants (*id.* at 9); on certain occasions, she was asked to deposit certain checks into her

account for Defendants and pay the cash (*id.*); Veronica Siniakovich, not Plaintiff, "was

responsible to make sure that all of the Defendants' payables were accurate" (*id.* at 10); summary

judgment should be used sparingly when a Plaintiff's intent and state of mind are at issue (*id.* at

11); and the Court should draw an inference in its favor since the District Attorney's Office "has

not yet found any wrongdoing by the Plaintiff" in the related criminal investigation (*id.*).

      Plaintiff also claims she has produced evidence demonstrating that she is owed unpaid

overtime pay.  (*Id.* at 12.)  Regardless, credibility issues are reserved for the jury and should not

be decided on a motion for summary judgment. (*Id.*)  Finally, if Defendants' motion is granted as

to the FLSA claims, Plaintiff urges the Court to deny supplemental jurisdiction over Defendants'

state-law counterclaims.  (*Id.* at 13.) In addition, Plaintiff explains that Defendants have already

recovered $750,000.00 from the Travelers Insurance Company for their state law claim of alleged theft. (*Id*. at 14.)

In Defendants' reply, they state that the majority of the statements in their 56.1 statements are "uncontroverted" and Plaintiff's remaining responses are ether "non-response, immaterial, and/or contradict the undisputed evidence in the record." (ECF No. 125 at 5-6) (Defs' Reply.) Although Defendants did not sue the other individuals, the evidence shows that Plaintiff was the "mastermind and chief beneficiary" behind the schemes since she created the employee profiles, entered the fraudulent hours, and subsequently received kickbacks from these persons once they obtained their direct deposits. (*Id*. at 8.) She further fails to cite to any evidence demonstrating that Veronika was the one responsible for the checks and balances for Defendants' companies. (*Id*.)

As to signing the checks, Defendants state they trusted Plaintiff and she violated that trust by singly signing checks and depositing monies into her account. (*Id*. at 9.) Regarding Plaintiff's argument on *mens rea*, Defendants state that the intent and state of mind are irrelevant to Defendants' counterclaims, as criminal intent is not necessary to establish their civil claims. (*Id*. at 10.) Finally, as to the related criminal investigation, Defendants state the pending status of the investigation has no bearing on Plaintiff being found civilly liable and nonetheless different burden of proofs are required in a criminal versus civil case. (*Id*. at 10-11.)

Defendants further assert that there is no legitimate reason to decline jurisdiction over their counterclaims because the faithless servant counterclaim and the FLSA claim by Plaintiff are intertwined based on the faithless servant doctrine serving as an affirmative defense. (*Id*. at 12-14.)

13

In their supplemental letter, Defendants summarize their contentions at the Oral Argument stating (1) that they filed their counterclaims in 2021 and the incidents occurred in 2017, so they are well within the applicable statute of limitations applicable to Defendants' counterclaims; (2) there are numerous factual statements that are uncontroverted by Plaintiff surrounding the unauthorized payroll scheme and the security deposit checks scheme; (3) they have demonstrated fraud by clear and convincing evidence given the undisputed bank statements; (4) as to the FLSA claim, Plaintiff's testimony and handwritten notes are wholly inaccurate and unreliable; (5) the Court should exercise supplemental jurisdiction over the counterclaims even if the FLSA claim is dismissed since the counterclaims re compulsory and arise out of the same transaction or occurrence; and (6) the damages sought total $1,139,664.03. (ECF No. 130.)

## **LEGAL STANDARD**

In order to obtain summary judgment, the movant must demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*¸ 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the burden shifts and the nonmovant may defeat the motion only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002).

14

"The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. New York City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to *identify* whether triable issue of fact exist. *See Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021). That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)). *Au fond*, the court's role is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." *Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (citing *Anderson*, 477 U.S. at 248 and *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

It is within this framework, that the undersigned considers the parties' submissions.

## DISCUSSION

### A. Plaintiff's Claims

Plaintiff alleges that she was not paid her appropriate wages and overtime pay under the FLSA and NYLL and is thus owed her unpaid wages, liquidated damages, attorney's fees, and other costs in accordance with these statutes. (ECF No. 1 at 6-7.)

Specifically, Plaintiff states she worked 9:00 AM to 5:00 PM from Monday to Thursday and 9:00 AM to 1:00 PM on Friday. (ECF No. 1 ¶ 16.) She claims she was paid $975 per week, which equates to $27.86 per hour. (*Id.*) She also states that she is entitled to an overtime hourly

15

pay rate of $41.79 for hours worked on the weekend and during the week in excess of 40 hours.

(*Id.* ¶ 17.)

She calculates her overtime hours as follows:

| 2018 | 1,790.9 hours |
|------|---------------|
| 2019 | 1,793.94 hours |
| 2020 | 1,378.7 hours |
| **Total** | 4,963.5 hours |

(*Id.* ¶¶ 18-21.)  She states that she was only paid an overtime hourly rate of $21.86.  (*Id.* ¶ 22.)

Had she been paid $41.79—her appropriate overtime rate—she would have received

$207,424.66.  (*Id.*)  In addition to the overtime monies owed, she also states Defendants failed to

pay her $4,875 in straight time.  (*Id.* ¶ 15.)  Defendants however asserts that "Plaintiff was paid

properly under all applicable wage and hour laws."  (ECF No. 14 at 6.)

"The FLSA requires that all hours worked in excess of forty hours per week be

compensated at one and one-half times the minimum wage."  *Torres v. Gristede's Operating*

*Corp.*, 628 F. Supp. 2d 447, 455 (S.D.N.Y. 2008) (citing 29 U.S.C. § 207(a)(1)).

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must

prove that [s]he performed work for which [s]he was not properly compensated, and that the

employer had actual or constructive knowledge of that work."  *Kuebel v. Black & Decker Inc.*,

643 F.3d 352, 361 (2d Cir. 2011).  The same standard applies for unpaid regular wages.  *See*

*Ennocenti v. Unisys Tech. Servs.*, No. 12-CV-6367, 2013 U.S. Dist. LEXIS 7792, at *5

(W.D.N.Y. Jan. 18, 2024) (citing *Kuebel* and applying it to a claim for regular unpaid wages

under FLSA).

Similarly, in order for a plaintiff to succeed on an Article 6 NYLL claim, she must

demonstrate first that she is an employee entitled to its protections and second that her "wages

were withheld in violation of one of the substantive provisions of the Labor Law."  *Kloppel v.*

*HomeDeliveryLink, Inc.*, No. 17-cv-6296-FPG-MJP, 2019 U.S. Dist. LEXIS 199891, at *8 (W.D.N.Y. Nov. 18, 2019).

"At summary judgment, a plaintiff must support [her] burden by first producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Stefanovic v. Old Heidelberg Corp.*, No. 18-CV-2093-LTS-JEW, 2022 U.S. Dist. LEXIS 157711, at *8 (S.D.N.Y. Aug. 31, 2022) (internal citations omitted). "If an employee's records are inaccurate or inadequate, it is well settled . . . that it is possible for a plaintiff to meet this burden through estimates based on [his or her] own recollection." *Id.* Once the Plaintiff meets this burden, the employer must then show the "precise amount of work performed" or "negate the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at *8-9.

There are several inconsistencies with Plaintiff's allegations. While Plaintiff states that Defendants did not pay her for almost 5,000 hours of overtime, her handwritten notes indicate that she worked, at most, 1,242.66 hours of overtime from 2018 to 2020. (ECF No. 114-1 ¶ 39.) In fact, this information is "uncontroverted" by Plaintiff. (ECF No. 115 ¶ 39.) Further in her deposition, she admitted that the hours she alleged in her Complaint were "inaccurate." (*Id.* ¶ 40.):

> Q: These two [handwritten] sets of hours, they're completely accurate as far as you're concerned?
>
> A: As far as I'm concerned, they should be.
>
> …..
>
> A: So like we discussed last time, I believe the calculations [in the verified complaint] might have been incorrect in the hours….

(ECF No. 123-7 at 115-16) ("Pl.'s Dep. Tr.")  Indeed, in her deposition, she conceded that she would record her hours on a separate sheet, then transpose them onto another handwritten log, which contributed to the present admitted errors.  (*Id.* at 30.)

In addition to Plaintiff's own statements about the inaccuracy of her timesheet recordings, Defendants have submitted Plaintiff's *time records* spanning from October 2016 through October 2020.  (*See* ECF No. 78) (discussing the attached spreadsheets which represent Plaintiff's time entered into the company's portal).  These records clearly demonstrate the inaccuracies between Plaintiff's handwritten records and the objective time records submitted into the portal.  For example, according to Plaintiff's time records, she states that she worked from 10:00 AM to 6:00 PM on December 16, 2018, and from 10:30 AM to 2:30 PM on December 23, 2018.  (ECF No. 25 at 6.)  However, time records indicate that she did not work on either of these days.  Notably for overtime hours, she claims she worked several times past 5:00 PM but these hours are not shown in the time records.  (*See e.g.* ECF Nos. 25 and 26 at 11-13) (stating that she worked overtime hours on November 21, 2019, April 6, 2020, and April 9, 2020 which are not present in company time records).  Additionally and conversely, there are several examples in which Plaintiff did not record the hours she worked.  For instance, time records indicate that she worked from 7:40 AM to 9:20 AM on October 16, 2019, but this notation is not in Plaintiff's log of hours.  (*See generally* ECF Nos. 25 and 26.)  And Defendants' time stamps demonstrate she worked in the evening on March 24, 2020 from 8:46 PM to 9:12 PM but these hours are nowhere to be found in Plaintiff's records.  (*Id.*)  Further, Plaintiff's recorded hours for certain dates are *completely different* than those entered into the portal.  She states that she worked from 8:30 PM to 10:30 PM on May 12, 2020, but the portal hours show that she worked from 11:05 AM to 11:54 AM.  She further claims she worked from 7:30 PM to

9:30 PM on January 9, 2020, but time records show that she only worked from 9:22 PM to 9:44

PM. (*Id.*); *cf. Vazquez v. 142 Knickerbocker Enters.*, No. 13-CV-6085(EK)(PK), 2024 U.S. Dist.

LEXIS 49645, at *46 (E.D.N.Y. Mar. 20, 2024) (finding that plaintiffs "accurately transposed

the data from physical records to their electronic submissions to the court" and granting damages

in accordance with the FLSA and NYLL). At her deposition, when confronted with the various

discrepancies between her recorded overtime hours and those alleged in the Complaint, Plaintiff

was unable to give an explanation and said she "would have to review other records" but

subsequently stated that she had indeed produced all documents in her possession regarding her

hours worked. (Pl.'s Dep. Tr. at 32, 111.); (*see also* ECF No. 131 at 13-14) ("Oral Argument

Tr.") (Q: "Aren't [the handwritten notes] inconsistent with each other?" A: "I can't dispute

that.")

Notably, Plaintiff does not state that *Defendants'* submitted time records are inaccurate.

Rather, she merely states in conclusory fashion that evaluating Plaintiff's credibility should be

done by a jury and is inappropriate for summary judgment. (*See* Pl.'s Opp. at 12). Thus, even if

Plaintiff had alleged that there was a discrepancy in Defendants' time logs, Plaintiff has failed to

put forth credible evidence controverting their records. *Lugardo v. Prima Pasta & Café, Inc.*,

No. 11-CV-1222 (MKB), 2013 U.S. Dist. LEXIS 48953, at *11 (E.D.N.Y. Apr. 4, 2013)

(dismissing plaintiff's FLSA claims and finding that plaintiff "failed to meet his *minimal* burden

of demonstrating that he performed work for which he was not properly compensated")

(emphasis added).

Given the inconsistencies in both Plaintiff's testimony and handwritten time logs in

comparison with the Complaint and Defendants' time records, there is no genuine dispute of

material fact that Defendants violated the FLSA in failing to pay her the appropriate wages. Therefore, Defendants' motion for summary judgment to dismiss the FLSA claim is granted.

## B. Defendants' Counterclaims
### a. Supplemental Jurisdiction

In light of the dismissal of Plaintiff's FLSA claim, the undersigned must next determine whether the Court has supplemental jurisdiction over Defendants' counterclaims.

Pursuant to 28 U.S.C. § 1367(c)(3), it is in the Court's discretion to exercise supplemental jurisdiction over state claims when all claims over which it had original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3). "When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims." *Baylis v. Marriott Corp*., 843 F.2d 658, 665 (2d Cir. 1988); *J.L. v. E. Suffolk Boces*, 113 F. Supp. 3d 634, 649 (E.D.N.Y. 2015) ("The Defendant is correct that courts in this Circuit routinely decline to exercise supplemental jurisdiction over state law claims where they have dismissed all of the federal law claims in the action."); *Singh v. Golam Mowla,* No. 19 CV 4687 (PKC)(LB), 2022 U.S. Dist. LEXIS 179520 at *23 (E.D.N.Y. Sept. 30, 2022) ("Generally, courts have found it appropriate to decline exercise of supplemental jurisdiction over state law claims where all FLSA claims have been dismissed."). Courts should balance the "values of judicial economy, convenience, fairness, and comity" in considering whether to exercise supplemental jurisdiction. *Kroshnyi v. U.S. Pack Courier Servs*., Inc., 771 F.3d 93, 102 (2d Cir. 2014) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988)). Typically, a court will exercise supplemental jurisdiction if the claims are "so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy." *Barrera v. FF an A*

*Restaurant Corp.*, No. 19 CV 2747 (RPK), 2021 U.S. Dist. LEXIS 62896, at *15 (E.D.N.Y. Mar. 29, 2021).

In *Stefanovic v. Old Heidelberg Corp*., defendants asserted a faithless servant counterclaim in an FLSA action stating that the plaintiffs engaged in a pattern of altering customer receipts.  *Stefanovic v. Old Heidelberg Corp*, No. 18 CV 2093, 2019 WL 3745657, at *3 (S.D.N.Y. Aug. 8, 2019).  The *Stefanovic* court held that it had supplemental jurisdiction over defendants' counterclaim because the FLSA claim and faithless servant affirmative defense would involve the facts underlying the counterclaim.  *Id.* at *2.  In contrast, the court in *Torres v. Gristede's Operating Corp*., 628 F. Supp. 2d 447, 467-68 (S.D.N.Y. 2008) stated that faithless servant counterclaims consisting of sexual harassment and falsification of an employment application did *not* share essential facts with the FLSA claims in order for both claims to be resolved in a single lawsuit for efficiency purposes.

Here, and like *Stefanovic,* the Court has supplemental jurisdiction over Defendants' counterclaims of fraud, faithless servant, and breach of fiduciary duty because the underlying facts of Plaintiff's wage and hour claims *are intertwined* with those of Defendants' counterclaims.  For example, Defendants assert that Plaintiff should be disgorged of all salaries she received during her period of disloyalty and her misconduct "eviscerates" her FLSA claim. (Defs' Memo of Law at 7.)  As such, the Court must review the FLSA claim and what Plaintiff was entitled to receive in conjunction with Plaintiff's purported misconduct to determine whether she is entitled to any damages.  *See Barrera*, 2021 U.S. Dist. LEXIS 62896 at *16 (stating that "counterclaims in a FLSA action present sufficient factual overlap to support a court's exercise of supplemental jurisdiction" in certain circumstances including when the facts in the counterclaims would be contested in the FLSA portion of the suit).  Relately, and unlike *Torres,*

21

which noted that the counterclaims were only permissive, the counterclaims asserted by Defendants here are compulsory because they "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim." *Jones v. Ford Motor Credit Co.,* 385 F.3d 205, 209 (2d Cir. 2004); *see also Torres,* 628 F. Supp. 2d at 467-68 (stating that the faithless servant counterclaims were permissive in comparison to the discrete sexual harassment and credit card fraud claims); *cf. Laracuente v. Major Otis LLC*, No. 15 CV 155 (RJD) (RML), 2016 U.S. Dist. LEXIS 64878, at *4-5 (E.D.N.Y. May 17, 2016) (finding that the state counterclaims and FLSA claim were "not derive[d] from a common nucleus of operative fact" since the FLSA claim was "a straightforward wage and hour action" which would have only required determination of his hours worked and rate of pay; however, his counter claims consisted of breaches of contract, duty of loyalty, and a loan agreement as well as misappropriation and unfair competition all of which would involve analyzing various provisions of an agreement and no overlap with the wage claims).

In addition, as pointed out by Defendants at Oral Argument, the Court has overseen the management of this case for three and a half years; therefore, this Court is better equipped with the knowledge to move the case forward rather than having it "get kicked back to the state court to start from scratch." (Oral Argument Tr. at 17.)

Having found that the Court has supplemental jurisdiction over the counterclaims, the Court next considers the merits of Defendants' counterclaims.

  **b. Faithless Servant Doctrine and Breach of Fiduciary Duty of Good Faith and Loyalty**

Defendants assert a breach of fiduciary duty and faithless servant counterclaim.  (*See generally* ECF No. 14.)

New York law requires agents to "be loyal to his employer and [are] prohibited from acting in any manner inconsistent with [their] agency or trust and [are] at all times bound to exercise the utmost good faith and loyalty in the performance of [their] duties.  *Calderon v. Mullarkey Realty, LLC,* No. 14-CV-2616 (PKC)(RLM), 2018 U.S. Dist. LEXIS 97224, at *23 (E.D.N.Y. June 10, 2018) (quoting *Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 200 (2d Cir. 2003)).  The duty of loyalty applies to cases "where the employee acts directly against the employer's interests" such as embezzlement.  *Pozner v. Fox Broadcasting Co*., 59 Misc. 3d 987, 900 (N.Y. Sup. Ct. 2017) (internal citations omitted).  Employees owe to their employer a duty of good faith and loyalty while performing their duties.  *Qosina Corp. v. C & N Packaging, Inc*., 948 N.Y.S.2d 308, 310 (App. Div. 2d Dep't 2012).  Employees may not act in ways contrary to the interests of their employer.  *Id*.

"A faithless employee forfeits the right to compensation, at least for services that are tainted by the dishonesty and perhaps more broadly."  *Id.* (citing *Henry v. Concord Limousine, Inc.*, No. 13-CV-0494 (JS) (WDW), 2014 U.S. Dist. LEXIS 9695, 2014 WL 297303, at *6 (E.D.N.Y. Jan. 24, 2014)); *Torres*, 628 F. Supp. 2d at 466 (stating that an employee that is "faithless in the performance of [her] services is generally disentitled to recover [her] compensation."); *CARCO Group, Inc. v. Maconachy*, 383 F. App'x 73, 76 (2d Cir. 2010) ("A person who is found to be faithless in his performance of services is generally liable for all compensation from the date of the breach, and the faithlessness need not have caused damages.").  Further, the employer is entitled to recover any monies obtained by the unfaithful

agent.  *See You Qing Wang b. XBB, Inc.,* No. 18-CV-7341 (PKC) (ST), 2022 U.S. Dist. LEXIS

57481, at *18 (E.D.N.Y. Mar. 29, 2022) (citing *Phansalkar*, 344 F.3d at 200).

New York courts have looked to the following standard to determine whether an

employee's conduct supports forfeiture under the faithless servant doctrine:

> (1) That the employee's disloyal activity was related to the performance of [her] duties, and
>
> (2) that the disloyalty permeated the employee's service in its most material and substantial part

*Id.*  The conduct that falls under the faithless servant doctrine typically concerns a "pattern of

disloyalty" and not merely "minor misconduct."  *Stefanovic v. Old Heidelberg Corp.*, No. 18-

CV-2093-LTS-JEW, 2022 U.S. Dist. LEXIS 157711, at *21-23 (S.D.N.Y. Aug. 31, 2022)

(finding that plaintiff engaged in only "petty pilfering" when he altered tips from customers 12

times over two years); *Miller v. Levi & Korskinsky*, LLP, No. 20 Civ. 1390 (LAP), 2021 U.S.

Dist. LEXIS 27448, at *13 (S.D.N.Y. Feb. 12, 2021) (stating that the plaintiff's misconduct and

unfaithfulness must "substantially violate the contract of service").

As articulated by the New York Court of Appeals long ago:

> An agent is held to [utmost good faith] in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal, as to forfeit any right to compensation for services.

*Murray v. Beard*, 7 N.E. 553, 554 (N.Y.1886); *cf. Meinhard v. Salmon,* 249 N.Y. 458, 464

(1928) ("A trustee is held to something stricter than the morals of the marketplace. Not honesty

alone, but the punctilio of an honor the most sensitive, is then the standard of behavior").

Misconduct under this standard typically arises under a breach of a duty of loyalty or

good faith.  *Miller*, 2021 U.S. Dist. LEXIS 27448 at * *13 (citing *Phansalkar*, 344 F.3d at 202).

New York courts have not reconciled the differences between these two standards.  *See Johnson v. Summit Acquisitions*, No. 15-CV-1193 (LEK/ATB), 2019 U.S. Dist. LEXIS 53954, at *26 (N.D.N.Y. Mar. 29, 2019) (citing *Phansalkar*, 344 F.3d at 202).  However, an employee can be a faithless servant under either standard.

A claim of breach of the duty of loyalty is essentially the same as a violation of the faithless servant doctrine "except that under the faithless servant doctrine, the employer need not show that the employee caused damages."  *Id*. at *24; *see Barrera v. FF an A Restaurant Corp.*, No. 19 CV 2747 (RPK), 2021 U.S. Dist. LEXIS 62896, at *17 (E.D.N.Y. Mar. 29, 2021) (stating that the elements for a breach of fiduciary duty are "that a fiduciary relationship existed, that the fiduciary knowingly breached one of the duties imposed by that relationship, and that damages resulted").

Here, Plaintiff was "dishonest" or otherwise "not loyal" to her employer given the circumstances, as explained above.  Her misconduct occurred over a number of years and took the form of various schemes.  Namely, she created ghost employees, caused Defendants to pay existing employees excessively, took security deposits from Defendants' tenant, and used company funds to pay her mother's expenses.  Defendants entrusted Plaintiff in her position, but Plaintiff betrayed that trust by engaging in fraud and disbursing millions of dollars that Defendants did not otherwise authorize.  ((ECF No. 123-81) ("David Malek's Aff.") (stating that Defendants did not authorize any the disbursed monies in this case); *see also CARCO Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218, 244 (E.D.N.Y. 2009) (finding that the employee was a faithless servant because he solely altered over 100 weekly reports which benefited himself and his family as opposed to the company and undermined management's authority in the process); *cf. Ametepe v. Peak Time Parking, Corp*., No. 18 Civ. 5384 (PAE) (SDA), 2021 U.S. Dist.

LEXIS 59567, at *22-23 (S.D.N.Y. Mar. 29, 2021) (denying summary judgment because defendant could not establish when the theft occurred and stating that the "[w]hether Ametepe engaged in thefts, and in a manner that made out all elements of the faithless-servant doctrine, goes to the credibility and weight of the evidence").  Further evidence of Plaintiff's faithlessness is the fact that she was fired from her job as Office Manager at Neptune for performing similar acts—that is, she deposited checks totaling approximately $8,000 payable to her employer into her own or her daughter's accounts.  (ECF No. 123-76) (Affidavit of Joshua Kurtz, Vice President of Neptune.)  Like the Defendants here, Neptune did not authorize these deposits.  (*Id.*)

Regarding Defendants' relief on these counterclaims, the fraud occurred from December 2017 to October 2020.  Plaintiff seeks relief from the FLSA from January 2018 to October 2020. Because the fraudulent and disloyal acts encompassed the time for Plaintiff's unpaid wages claims, Plaintiff's FLSA claim is completely extinguished, which means Plaintiff must now pay back the salary she received from Defendants during her period of disloyalty.  *See CARCO Group, Inc. v. Maconachy*, 644 F. Supp. 2d 218, 244 (E.D.N.Y. 2009) (finding that the faithless servant was to forfeit all compensation from 2003 to 2005 totaling $889,711 which included his base salary, fringe benefits, and incentive compensation); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 208 (2d Cir. 2003) ("Phansalkar is required to forfeit all compensation awarded to him after October 15, 1999…the date upon which his disloyalty began").

For the reasons stated, Plaintiff is deemed a faithless servant and breached her duty of good faith and loyalty to Defendants.

### c.   Fraud

Defendants allege that Plaintiff "intentionally concealed and misrepresented material facts" concerning (1) the fictitious and existing employees; (2) the tenants' security deposits to tenants; and (3) her personal expenses.  (ECF No. 14 at 17-18.)  Defendants state that Plaintiff

26

did this by fabricating all related documentation and obscured information concerning the security deposits thereby inducing Defendants to make payments to these fake employees.  (*Id.*)

"The elements of fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to plaintiff."  *Zurich Am. Life Ins. Co. v. Nagel,* 590 F. Supp. 3d 702, 723 (S.D.N.Y. 2022) (citing *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999)).  These elements must be proven by clear and convincing evidence. *Goodman v. Waugh,* 882 F. Supp. 64, 65 (S.D.N.Y. 1995).

Here, there no genuine issues of material fact concerning whether Plaintiff committed the frauds at issue:

### i.   <u>Fictitious Employees</u>

*First,* Plaintiff disclaims having entered employee's time unilaterally since she "solely acted as an intermediary between the Defendants and StaffPro" and acted only "based on time records with which she was provided by the Defendants' employees and approved by the Defendants' Managing Agents."  (ECF No. 115 ¶ 23.)  Therefore, she says, "she never utilized any discretion in submitting such payroll hours [to] StaffPro."  (*Id.*)

Although Plaintiff states that she only processed time worked based on employees' submitted timesheets, Plaintiff's deposition testimony demonstrates that she had the authority to review employee application forms and input data from timesheets into spreadsheets to be sent to StaffPro for payment to employees.  (Pl.'s Dep. Tr. at 15, 36, 46.)

*Relatedly,* Plaintiff states that an employee named Veranika Siniakovich, not Plaintiff, was responsible for ensuring the accuracy of all of Defendants' payables. (ECF No. 115 ¶ 6.) However, Michael Malek's deposition indicates that Plaintiff "basically handled everything in [their] office."  (ECF No. 123-16 at 8) ("Michael Malek's Dep. Tr.")  As a supervisor in Defendants' offices, Plaintiff would oversee accounts payables and receivables and "had access

27

to all the bank accounts," performed bank reconciliations, and "processed security checks" as well as "payroll every single week."  (*Id.* at 10); (David Malek's Aff.) (affirming that Plaintiff had access to company managed bank accounts and had the ability to issue checks and submit employee payroll).  Michael Malek continued that Plaintiff "was able to add whatever amount of hours to people and whatever amount of employees she wanted without [Defendants] knowing." (Michael Malek's Dep. Tr. at 12.)

*Second,* Plaintiff states it would be impossible for her to commit the acts Defendants complain of considering that she "was not a signatory on any of the Defendants' accounts." (ECF No. 115 ¶ 28.)  The only way in which a check would be issued is if an employee submits an invoice with "backup," or supporting documentation, and Defendants' manager, owner, or principal approves it and then submits it to accountable payable for processing.  (*Id.*)  Plaintiff must have caused the checks to be issued *without Defendants' knowledge* and subsequently deposited it to her own account.  (ECF No. 117 ¶ 28.)  Nonetheless, the individual Defendants trusted that the checks Plaintiff issued and presented to them for signature were valid.

*Finally*, Plaintiff admits that Leontyev agreed to be on Defendants' payroll as a means of repaying monies she owed him.  (ECF No. 115 ¶ 42.)  However, she disclaims having any involvement in a decision to hire him and states she never engaged in any scheme to wrongly obtain payments.  (*Id.* ¶ 43); (Pl.'s Dep. Tr. at 130.)  She contends that she received 70% of all pay from Defendants but she never knew whether the monies were wrongfully obtained.  (ECF No. 115 ¶ 66.)

However, Plaintiff was the ringleader in this entire operation despite her purported amnesia of the events that occurred.  At her deposition, she never disclosed that the loan to Leontyev was made *prior* to Leontyev's employment with Defendants and that he was only

employed by Defendants to pay off the loan in the first place.  (Pl.'s Dep. Tr. at 124, 127)

(stating that she lent Leontyev money during his employment with Defendants since he was not

getting paid immediately and also needed money for supplies he used on the job); (*see also id.* at

189-90) (stating that she does not recall sending Leontyev money at any other time).  Further,

she never fully disclosed why she was receiving large payments from Leontyev to her personal

bank account: "I think he Zelled me some money that he borrowed from me a while back."

(Pl.'s Dep. Tr. at 124.)  Indeed, when asked in her deposition about her relationship with

Leontyev, she stated he was only an "acquaintance."  (*Id.* at 119.)  However, Leontyev stated

that he has known Plaintiff since they were in elementary school and became reacquainted in

2015.  (ECF No. 123-8 at 15) ("Aleksander Leontyev's Dep. Tr.")

 Meanwhile in Leontyev's deposition, he states that Plaintiff lent him approximately

$24,000 prior to his employment with Defendants in order to assist with his music business.

(Aleksander Leontyev's Dep. Tr. at 22.)  As to his subsequent work with Defendants, he stated

that he never interviewed for the job nor performed work for Defendants and that *Plaintiff* set

him up with a job as a means to pay her back for the loan.  (*Id.* at 30, 33, 43-44.)  This ruse was

Plaintiff's idea and although she did not say he had to follow through with this scheme, Plaintiff

told Leontyev that he "had to pay her money back somehow."  (*Id.* at 37.); (*see also* Oral

Argument Tr. at 9) (stating that Plaintiff's position is that the payments from Leontyev were

"just in repayment of loans she made to him").  He noted that the direct deposits to his account

working as a handyman for Defendants were "excessive."  (*Id.* at 45, 47.)

 Leontyev expressed that he wanted to get off the payroll.  (*Id.* at 48.)  By the time he was

released from Plaintiff's shackles, he had transferred to Plaintiff at least $126,000, which is more

than five times what she lent him.  (*Id.* at 48.)  However, upon ejecting him from the scheme,

Plaintiff stated that she needed replacements for him and he then recruited James and Leon.  As to Plaintiff's liability in this case, Leontyev said he "feel[s] no need to defend [Plaintiff] because she took advantage of [him]."  (*Id.* at 85.)

Similarly, as to the other fictitious employees—Michael James (Leontyev's roommate and business partner) and Valerie Leon (Leontyev's sister)—Plaintiff claims she does not know who hired them and their relation to Leontyev.  (*See generally* Pl.'s Dep. Tr.)  More importantly, she contends she does not know why there are checks addressed to Leon in her account and cannot remember whether Leon or James asked her to cash checks on their behalf.  (Pl.'s Dep. Tr. at 195-96, 199.)  Notably, at Oral Argument, Plaintiff's counsel could not cite to any evidence to support her cashing checks for other individuals.  (Oral Argument Tr. at 12-13) (demonstrating that Plaintiff's counsel could not controvert the thousands of pages of bank records evidencing her retaining defendants' proceeds).  Like Leontyev, James lived in Florida throughout his *entire* employment period with Defendants and it is highly unlikely that he traveled from Florida to New York to complete the alleged hours.  (Aleksander Leontyev's Dep. Tr. at 14, 60.); (*see also* Oral Argument Tr. at 7) ("[Leontyev] was living in Florida for a part of the time that he was allegedly performing work for defendants.")  James sent Leontyev approximately $53,000 during the time he was on payroll (*id.* at 60).

Leon and James never performed any work for Defendants or interviewed for the job and did not fill out timesheets while employed for Defendants.  In fact, Leon had a full-time job and was merely on Defendants' payroll as a favor for her brother, Leontyev.  (Aleksander Leontyev's Dep. Tr. at 62); (ECF No. 123-11 at 9) (Valerie Leon's Dep. Tr.) (noting that Leon currently works as an administrative manager at Mount Sinai and as an HR assistant from November 2019 through December 2021).  She sent all the monies to Leontyev, and he would then send a portion

of the direct deposit to Plaintiff.  (*Id.* at 69-70.)  Despite Plaintiff's denial of involvement with

any of the above schemes, the direct deposits to Leon and James notably ceased when Plaintiff

was terminated in October 2020.  (*Id.* at 70; ECF No. 123-10 at 29 (Michael James Dep. Tr.); *see*

*also* Affidavit of Elly Geldwerth.)

Plaintiff assisted with the submission of these "employee" applications and submitted

them to StaffPro, knowing that these were fictitious employees and with the intention of having

Defendants sign off on their timesheets so she can benefit.  As a result of their being on the

payroll, Leontyev, James, and Leon were unlawfully paid $417,663.02, resulting in damages to

Defendants.

### ii.   Excessive Payments to Existing Employees

Veranika Siniakovich, Defendants' employee, explained that additional work, like the

claimed work completed by Dubno and Salvo here, must be supported by invoices and obtain

management's approval.  (ECF No. 123-82) (Veranika Siniakovich Aff.)  However, no

timesheets or supporting documentation existed for the work that Dubno and Salvo were paid for

in this instance.  (*Id.*)

For both the fictitious employees as well as the existing employees, Defendants' claims

that Plaintiff committed fraud is further bolstered by the fact that Plaintiff entered time into the

portal using her own StaffPro account.  (*See* Affidavit of Elly Geldwerth.)  This means that she

was solely responsible for fraudulently inputting their time and did so without authorization.  Her

scheme led to excessive payroll to Dubno and Salvo amounting to $334,299.19.  (ECF No. 130

at 7.)

### iii.   Security Deposit Checks

Plaintiff explains that approval was needed for signing off and issuing checks occurs with

respect to tenants' security deposits.  (ECF No. 115 ¶ 30.)  Therefore, she could not have

unilaterally processed these return checks since they require managerial approval before doing so.  (Pl.'s Dep. Tr. at 56-57.)  Defendants again object, stating that she likely processed these checks without Defendants' knowledge.  (ECF No. 117 ¶ 30.)

Even viewing the evidence in Plaintiff's favor, it is simply unimaginable that Plaintiff received checks from or made payable to the following people and did not find any reason to dispute or otherwise reverse the payment out of her account: Defendants' Property Manager Aaron Lazar (ECF No. 115 ¶ 144); Guido Salvo (*id.* ¶ 150); Leontyev (*id.* ¶ 177; *see also* ECF No. 123-55 (check for $1,725 made out to Leontyev)); Michael James (ECF No. 115 ¶ 194; ECF No. 123-57); Valerie Leon (*id.* ¶ 203, ECF No. 123-58); and Dubno (Pl.'s Dep. Tr. at 74; ECF No. 123-48) (demonstrating that Plaintiff deposited a check for Dubno in the amount of $1,452.29 into her own account).  These individuals even testified they did not authorize her to deposit those checks into her bank account, despite her statements that these individuals specifically asked her to cash the checks for them from her account.[10]  (ECF No. 115 ¶¶ 146, 151, 157, 184, 198, 211); (Pl.'s Dep. Tr. at 70, 74-75.)

Worse for Plaintiff is that she deposited sixteen security deposit return checks made payable to her daughter, Nicole Francis Roytlender, into her own personal bank account.  (ECF No. 115 ¶¶ 168-69); (*see also* ECF No. 123-51) (demonstrating that Plaintiff used her daughter's name to make out various checks).  Plaintiff *herself* testified that her daughter was never a resident in any of Defendants' buildings but claims she could not recall why any of the deposits were made payable to Nicole.  (ECF No. 115 ¶¶ 174-75); (*see also* Pl.'s Dep. Tr. at 8, 61, 87); (*id.* at 208) (Q: "You have no explanation to why any of these checks are in your bank account?"

---

[10] Leontyev was unaware that checks were even issued in his name and stated he was only aware of this fact one he received the subpoena for this case.  (Aleksander Leontyev's Dep. Tr. at 72.)

A: "I don't remember the specifics of these checks."); (Oral Argument Tr. at 11) (Q: "What about the ones that went to her daughter Nicole?" A: "That, I don't think she has any explanation for that.")

Further, none of the above individuals lived in Defendants' buildings and would therefore not have any reason to receive a tenant security deposit. David Malek testified that Plaintiff was not authorized to issue a security return check to any persons that were not tenants. (David Malek's Aff.) Of note here is that at the pre-motion conference before the undersigned, when Plaintiff's counsel was asked whether Plaintiff had a defense to depositing the tenant security deposits into her personal account, Plaintiff's counsel conceded he did not "know what to say to that." (ECF No. 120.)

Plaintiff's scheme in stealing these sixty (60) checks resulted in damages to Defendants of approximately $196,624.

### iv.  **Personal Expenses**

In Plaintiff's deposition, she said that Defendants paid her personal expenses as part of her compensation such as her vehicle, which was signed by David Malek himself. (Pl.'s Dep. Tr. at 159-60.) However, this directly contradicts Defendants' deposition testimony which states that Defendants did not authorize any of these payments. (Michael Malek's Dep. Tr. at 14.) Even if Defendants agreed to pay Plaintiff's expenses, her personal expenses versus expenses for her mother, Nonna Yelan, are completely different. Defendants definitively state they never authorized paying the Optimum expenses.

Further, Plaintiff's liability is increasingly apparent in the emails between her and Defendants and other personnel in which she states she would retrieve the backup documentation for the optimum bills purportedly to be deducted from superintendent Soto's paycheck, but never did—certainly because they did not exist. (Pl.'s Dep. Tr. at 162-63) (stating that superintendent

Jose Soto was having difficulties paying his cable bill so the company agreed to pay his cable bill and would withdraw the amounts from Soto's paycheck in increments); (*see also* ECF No. 123-69) (Soto's paychecks); Pl.'s Dep. Tr.) (email chain between Defendants, Plaintiff, and other employees discussing lack of documentation for Optimum payments).  However, upon review of Soto's paychecks, there are no deductions for cable bills.  (*See generally* ECF No. 123-69.)  Further, she could not recall who asked her to process these payments on Soto's behalf nor whether she ever submitted the backup documentation to Defendants.  (*See* Pl.'s Dep. Tr.at 164-65.)

Finally, in Defendants' first set of requests for admission (ECF No. 123-6), Plaintiff herself admitted that her mother had an Optimum account and there were payments connected with her mother's account that Defendants were paying. This final scheme by Plaintiff resulted in damages of $2,253.63.[11]

All four schemes fulfilled by Plaintiff occurred as a result of Defendants' entrustment of duties with Plaintiff and Plaintiff's taking advantage of Defendants' trust.  As a result, Plaintiff stole approximately $951,000 from Defendants.

---

[11] Notably, Defendants were paid $750,000 in insurance monies as a result of their submission of proof of Plaintiff's fraud.  (ECF No. 123-73.)  Specifically, Defendants received monies for Plaintiff's issuing fake checks and payroll to both Dubno and Leontyev.  (*Id.*)  However, at Oral Argument, Defendants conceded that if damages were awarded, the Travelers' payments would reduce the total monies to be awarded to them.  (*See* Oral Argument Tr. at 17) (Defs.' Counsel: "With respect to the Travelers Insurance payment, I'm fairly certain that they are going – if they get a judgment, defendants are required to pay that money back, so that's an issue that is completely irrelevant here." Court: "Okay. It becomes an offset." Defs' Counsel: "Yeah.")

### d. Damages

Defendants request $1.14 million for the damages they sustained as a result of Plaintiffs' misconduct and the salaries paid to Plaintiff during her period of disloyalty.  (Defs' Memo of Law at 25, 30.)

As noted above, the Court has already found that Plaintiff is liable for fraud for all of the aforementioned schemes. Defendants' submitted documentation in support of their request for damages is uncontested, however extant are some inconsistencies.  For example,

- Defendants state that Leontyev's theft totaled $282,894.50 before taxes, however, the amounts total $282,940.98;

- Defendants calculate Dubno's damages at $309,255.03 in the 56.1 statement (ECF No. 117 ¶ 222 and in the supplemental letter Defendants state that Dubno received $273,895.03 in unauthorized payroll (ECF No. 130 at 7), but the documentation equals $307,755.03 in damages.

- Not mentioned in Defendants' 56.1 statements but only mentioned in the memorandum in support and Defendants' supplemental letter is the fact that Salvo was paid $60,334 in unauthorized payroll (Defs' Memo of Law at 12; ECF No. 130 at 7.)

Below is a summary of the amounts calculated by the Court based on the Defendants' submitted documentation versus the amounts Defendants request.

| | Documentation/Supporting Exhibits (56.1s and checks/statements) | What Defendants Request (ECF No. 130) | Difference Between Support and Defendants' Request |
| --- | --- | --- | --- |
| **Forfeited Salary from Jan. 2017 through Oct. 2020** | $188,895 | $188,895 | $0 |
| **Security Checks** | $196,623.19 | $196,623.19 | $0 |
| **Monies Stolen by Leontyev** | *$282,940.98* | *$282,894.50* | *$46.48* |

| | | | |
|---|---|---|---|
| **Monies Stolen by James** | $96,984.85 | $96,984.85 | $0 |
| **Monies Stolen by Leon** | $37,783.67 | $37,783.67 | $0 |
| **Monies Stolen by Dubno** | *$307,755.03* | *$273,895.03* | *$33,860* |
| **Monies Stolen by Salvo** | *$80,049* | *$60,334.16*<br><br>*(excludes additional repair and maintenance and capital improvement work paid to Salvo)* | *$19,714.84* |
| **Optimum Payments** | $2,253.63 | $2,253.63 | $0 |
| **TOTAL** | *$1,193,285.35* | *$1,139,664.03* | *$53,621.32* |

Nonetheless, even despite the errors, the Court finds that no genuine dispute of material fact exists as to damages as to the lower amount of the figures.  In fact, Plaintiff has not submitted a supplemental letter to the Court after Oral Argument responding to Defendants' contentions or clarifying any discrepancies raised at the Oral Argument.  Furthermore, Defendants now request nearly $54,000 *less* than the amounts indicated in the supporting exhibits and 56.1 statements.  *See Xerox Corp. v. Print & Mail by Morrell, Inc.,* 13 F. Supp. 3d 265, 268 (W.D.N.Y. 2014) ("While the amount of damages sought is substantial, they are supported by Xerox's business records and sworn testimony, and no question of fact has been raised to dispute those damages. In fact, the Court notes that Xerox has requested less than the full measure of damages it might otherwise have claimed under the agreements... Accordingly, the Court finds that an award of summary judgment in favor of Xerox is appropriate.").  Given that Plaintiff fails to controvert both the evidence based on damages as well as Defendants'

36

request for damages, no issues of fact exist, so a trial on the issue of damages is not warranted. *See BBK Tobacco & Foods, LLP v. Galaxy VI Corp.,* 17-CV-4079 (BCM), 2020 U.S. Dist. LEXIS 95397, at *14 (S.D.N.Y. May 31, 2020) ("District courts may grant summary judgment as to damages for which there exist *no* disputed issues of material fact.") (emphasis added) (internal citations omitted).  Accordingly, the undersigned grants summary judgment on damages for Defendants.

> i.  **Pre-Judgment Interest**

Absent from the parties' motion papers is any briefing on the entitlement and calculation of pre-judgment interest on damages, which is mandatory.  *See Brown v. Stinson*, 821 F. Supp. 910, 916 (S.D.N.Y. 1993) (finding that pre-judgment interest was mandatory in the fraud case even if it was not requested by the movant).  "Under New York law, awarding prejudgment interest on damages awarded for fraud is mandatory." *Bolivar v. Fit Int'l Group Corp.*, 12cv781 (PGG) (DF), 2017 U.S. Dist. LEXIS 39887, at *62 (S.D.N.Y. Mar. 16, 2017) (quoting *In re Crazy Eddie Sec. Litig.*, 948 F. Supp. 1154, 1166 (E.D.N.Y. 1996)).  Since the claims arise under state law, in New York Plaintiff is entitled to pre-judgment interest on the damages from the time of the misconduct, at a rate of nine percent per annum.  *See* N.Y. C.P.L.R. §§ 5001, 5004.

In light of the above award of damages, the parties are directed to file letter briefs addressing Defendants' entitlement to and the amounts, if any, of prejudgment interest on the damages awarded herein.  The briefs shall address the date or dates of when the prejudgment interest clock began to accrue.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted (ECF Nos. 123 and 130) as follows:

(1) Counts One and Two of the Complaint are dismissed, with prejudice;

(2) Defendants are awarded judgment on liability and damages on counts one, two and three of the counterclaims in the Answer in the amount of $1,139,664.03;

(3) The parties are directed to file letter briefs addressing Defendants' entitlement to and the amounts, if any, of pre-judgment interest.  The letter briefs shall be filed on or before August 16, 2024.

(4) The trial originally scheduled for September 9, 2024 and all other associated deadlines are cancelled.

Dated: Central Islip, New York
July 29, 2024

**S O   O R D E R E D:**

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge